**First Division**
November 2, 2009

No. 1-08-0901

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 18829 |
| | ) | |
| CARL ARMSTRONG, | ) | The Honorable |
| | ) | Michael Toomin, |
| Defendant-Appellant. | ) | Presiding Judge. |

JUSTICE GARCIA delivered the opinion of the court.

Following a bench trial, the defendant was convicted of the involuntary manslaughter of his three-month-old son and sentenced to seven years in prison. The defendant's primary contention on appeal centers on when his son was legally brain dead to trigger the application of section 103-2.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-2.1 (West 2006)). Under section 103-2.1, all in-custody interrogations not electronically recorded are presumed inadmissable, except "when the interrogators are unaware that a death has in fact occurred." (Emphasis added.) 725 ILCS 5/103-2.1(e)(viii) (West 2006). The circuit court found this exception to apply, thus permitting

nonrecorded and electronically recorded interrogations of the defendant to be admitted into evidence.

Because it is incontrovertible that the defendant's son was medically diagnosed as brain dead after the nonrecorded interrogations were concluded, we find the three interrogations of the defendant at issue were not subject to suppression under section 103-2.1. We also find the suppression hearing subpoenas to medical personnel were properly quashed as the medical diagnosis of brain death was conclusive as to when death occurred under the facts of this case. Under the totality of the circumstances, the defendant's statements given during the three interrogations were voluntarily made. Finally, under the facts of this case, it was not reversible error to refuse to conduct a Frye hearing before admitting expert testimony regarding Shaken Baby Syndrome. We affirm.

## BACKGROUND

While in the sole custody of the defendant, Carl Armstrong, Jr. (CJ), suffered multiple head injuries, including a fractured skull, bilateral subdural and subarachnoid hematomas, bilateral retinal hemorrhaging, and swelling of the brain on July 25, 2006. At 4:15 p.m. on July 27, 2006, CJ was pronounced brain dead at the University of Chicago Hospital.

When the incident happened, the defendant was 17 years old.

**2**

CJ's mother, Aprileta Briggs, was the defendant's girlfriend. Aprileta's mother, Anita Adams, considered herself the defendant's "second mama." Cynthia Armstrong, the defendant's mother, was married to Evan Chappell. Mr. Chappell was the defendant's mentor and father figure. The defendant also has a younger sister, Jasmine Chappell. Prior to this incident, the defendant had no criminal history.

Mr. Chappell described the defendant as a loving father who was very involved in the care of CJ. He watched him, bathed him, fed him, and played with him. Aprileta testified the defendant was a good father, who was always there for his child.

On the morning of July 25, 2006, Jasmine was asleep at Mr. Chappell's house, three blocks from the home she shared with the defendant. Shortly after 8:30 a.m., she awoke to a phone call from the defendant, who told her CJ was not breathing. Jasmine testified the defendant sounded scared and was crying. Jasmine called her mother at work, got dressed, and ran over to her house. When she arrived, she saw the defendant crying while pacing back and forth with CJ in his arms. Shortly after, the paramedics arrived and took CJ from the defendant.

The paramedics took CJ to the University of Chicago Hospital. The defendant and his family followed. The doctors diagnosed CJ with severe brain injuries.

During the initial evening at the hospital, the defendant was interviewed by the police.  Following the defendant's arrest for aggravated battery at approximately 7 p.m. on July 26, 2006, the police conducted three custodial interrogations: at 9:30 p.m. on July 26, 2006; from 2 p.m. until 5 p.m. on July 27, 2006; and beginning just before midnight on July 27, 2006.  During the first interrogation, the defendant maintained CJ's injuries were the result of an accidental fall from a bed.  At the end of the second interrogation, the defendant made some inculpatory statements.  During the third interrogation, the only one recorded, the defendant made a videotaped statement in which he admitted he shook CJ and threw him to the ground.  Following CJ's death, the defendant was charged with first degree murder.

## Motion to Suppress

Defense counsel filed a pretrial motion seeking to suppress the defendant's statements to the police, including his videotaped confession.  The defendant argued the statements given at his first two interrogations were inadmissible under section 103-2.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1 (West 2006)), because neither custodial interrogation was electronically recorded.  The third interrogation was also inadmissible under subsection (d) of section 103-2.1, according to the defendant, because it was

**4**

inextricably linked to the second nonrecorded interrogation when his first inculpatory statements were elicited. The defendant also argued that all three interrogations resulted in involuntary statements.

At the suppression hearing, the testimony regarding the interrogations came from Special Victims Unit Detective Gregory Auguste and his partner, Detective Louis Mahaffey. On July 25, 2006, at around 5 p.m., the two were assigned by Sergeant Duffin to investigate CJ's injuries. Before going to the hospital, the detectives reviewed a "Child Abuse Hotline Notification" in which the caller, Lisa Kuntz, a social worker at the University of Chicago Hospital, stated she "did not know if the infant will live." Sergeant Duffin was informed that CJ was in critical condition and that CJ could die before the detectives arrived at the hospital. Sergeant Duffin assigned a homicide detective, Detective David Golubiak, to the investigation as well. Homicide detectives are not generally assigned to assist Special Victims Unit detectives in their investigations of child abuse.

Detectives Golubiak, Auguste, and Mahaffey went to the hospital, where they interviewed doctors and family members. Detectives Golubiak and Auguste spoke with Dr. Jill Glick via telephone. At the suppression hearing, Detective Auguste described Dr. Glick as a "child abuse expert" at the hospital.

Dr. Glick informed the detectives that CJ was in critical condition with catastrophic injuries. According to Detective Auguste, when he asked Dr. Glick whether CJ was going to die, she could not say. Detective Mahaffey interviewed Ms. Kuntz, who related that the defendant had told her that CJ's injuries were the result of a fall from a bed.

Detectives Golubiak and Auguste each testified they interviewed the defendant at the hospital at around 7 p.m. on July 25, 2006. Prior to the interview, Detective Auguste knew the defendant was 17 years old and had no prior criminal history. Detective Auguste testified he told the defendant he wanted to speak to him in private and the defendant agreed. The detectives took the defendant to a private room at the hospital. Mr. Chappell knocked on the door of the room, informed the detectives he was the defendant's stepfather and asked to be present during the interview. Detective Auguste refused. With only the detectives present, the defendant recounted what had happened during CJ's entire stay with him. The defendant described the events consistent with an accident. The interview lasted two hours.

Detective Auguste questioned other family members, including the defendant's mother and sister and CJ's mother and maternal grandmother. Detective Auguste testified that at that point, he

could not determine whether a crime had occurred.

Around 10 p.m., all three of the detectives went to the Armstrong home with the defendant and his mother to take photographs and continue their investigation.

Numerous witnesses described the defendant's emotional state on July 25, 2006, while at the hospital. Mr. Chappell described the defendant as upset, sad, and crying. The defendant's mother testified that when she arrived at the hospital, around 10 a.m., the defendant was crying and hugging Aprileta and that the defendant was still crying and hugging Aprileta and his sister at 5 p.m. Ms. Kuntz's notes from her interview of the defendant on that day reflect that he was crying with his shirt pulled over his head. Neither Mr. Chappell nor Ms. Adams, Aprileta's mother, recalled seeing the defendant eat or drink anything that day.

a. First Custodial Interrogation

Detective Auguste testified he renewed the investigation on July 26, 2006, at 5 p.m. Detective Auguste spoke on the telephone with Dr. Kelly Staley, a colleague of Dr. Glick at the hospital. According to Detective Auguste, Dr. Staley could not determine whether CJ would live or die. Dr. Staley reported that CJ's prognosis for quality of life was not good; he could be blind, with severe brain damage. Dr. Staley also told Detective Auguste that doctors were conducting brain death exams on CJ.

Detective Auguste was asked to explain what Dr. Staley's statement regarding brain death exams meant to him. He replied, "[It] means the subject's brain is dead or *** could be dead." Shortly after Detective Auguste's conversation with Dr. Staley, the detectives received a report by facsimile from the hospital, issued by Drs. Glick and Staley, detailing CJ's injuries and the recommendations for his treatment ("CPS consensus report").

The CPS consensus report showed that when CJ was admitted into the hospital, he had the lowest possible score on the Glasgow Coma Scale, a three, which is consistent with brain death. CJ's pupil exam also suggested possible brain death. The critical care team began its evaluation of CJ immediately upon his arrival. The report did not state that CJ's death was imminent or whether the doctors expected CJ to die from his injuries.

After reviewing the report, Detectives Auguste and Mahaffey believed that CJ's injuries were not accidental. At 7 p.m. on July 26, 2006, the detectives went to the hospital to bring the defendant to the police station for questioning. When the detectives arrived at the hospital, they found the defendant at CJ's bedside, along with other family members. Detective Auguste recalled the defendant appeared sad and upset. The detectives testified they told the defendant's mother they were taking him

to the police station.

Ms. Armstrong, the defendant's mother, testified that the detectives told her they would keep the defendant for a couple hours. If they did not bring him back within a couple hours, she could come to the police station to pick him up. Ms. Armstrong testified she asked to go, but the detectives refused.

Ms. Adams, CJ's maternal grandmother, similarly recalled that the detectives stated they would return the defendant to the hospital after questioning him. Ms. Adams testified she told the detectives that someone needed to go with the defendant to the police station because he was only 17 years old, but they told her that because the defendant was not her son, it was none of her business. Detective Auguste denied that he told the women he would bring the defendant back to the hospital or that either woman asked to accompany the defendant to the police station.

At 7:30 p.m. on July 26, 2006, Detectives Auguste and Mahaffey took the defendant from the hospital to the police station, where he was arrested for aggravated battery to a child. The detectives placed the defendant in interview room six, which had video recording capability, but the video recorder was not activated.

At 9:30 p.m., the detectives moved the defendant to a lineup viewing room, which contained a table for the detectives to write

notes. The lineup viewing room did not have video recording capability. Detective Auguste advised the defendant of his Miranda rights. The defendant indicated he understood his rights and agreed to speak with the police.

During this first interrogation, which lasted four hours, the defendant continually denied abusing CJ. The defendant recounted the events in a manner consistent with an accident, stating that CJ had fallen from a bed. Detective Auguste informed the defendant that the doctors found his account inconsistent with the severity and variety of CJ's injuries. The defendant offered to take a polygraph exam. Detective Auguste offered the defendant food and water, which he refused. The interrogation ended with the end of Detective Auguste's shift; the defendant was taken to the lockup.

Ms. Armstrong testified that shortly after the defendant's arrest on July 26, 2006, she went to the police station and asked to see her son. Ms. Armstrong claimed that after waiting for an hour, she met with Detective Auguste, who informed her that she could not see her son because they were "not finished with him." Ms. Armstrong testified she asked to speak to a superior and was taken to speak with Detective Golubiak. Ms. Armstrong testified Detective Golubiak also informed her that the police were not finished questioning her son. Ms. Armstrong asked Detective

**10**

Golubiak to see her son, but she claimed he refused her request.

Detective Auguste testified he could not recall whether he saw Ms. Armstrong on the evening of July 26, 2006, but denied taking her to see Detective Golubiak. Detective Golubiak testified he had no contact with Ms. Armstrong that day. Detective Auguste testified that while the defendant was in custody, he never asked to speak with his mother.

Numerous witnesses testified concerning the defendant's emotional and physical condition at the hospital prior to his arrest on July 26, 2006. They claimed he did not eat or sleep that day and that he remained visibly upset during the entire time at the hospital. Josephine Eatman, a Department of Children and Family Services (DCFS) investigator assigned to CJ's case, testified that when she saw the defendant in CJ's hospital room on July 26, 2006, he was crying while slumped over in his chair, with his shirt over his head.

Ms. Armstrong testified that she was told by Ms. Kuntz at 3 p.m. on July 26, 2006, that CJ had undergone a CT scan of his brain earlier that morning and that he was brain dead.

### b. Second and Third Interrogations

Detective Auguste testified that prior to arriving at the station on July 27, 2006, he made phone calls about scheduling a polygraph exam for the defendant, but was unable to schedule one.

**11**

The defendant never underwent a polygraph exam. About an hour after he arrived at work, Detective Auguste spoke with Dr. Staley by telephone. Dr. Staley informed him that CJ was in critical condition, that his brain was herniated and pushing down into his spinal column. Detective Auguste asked Dr. Staley whether death was imminent; Dr. Staley replied that she could not say whether CJ would live or die.

After this conversation with Dr. Staley, Detective Auguste, at about 1:45 p.m., took the defendant from the lockup, brought him into interview room six and offered him food, water, and the use of a bathroom. The defendant declined the detective's offer. At 2:09 p.m., Detectives Auguste and Mahaffey took the defendant to the lineup room. Detective Auguste again advised the defendant of his Miranda rights. The detectives questioned the defendant for about three hours. Detective Auguste testified he again told the defendant that his account was inconsistent with CJ's injuries and that the doctors had led him to believe that CJ had been shaken. The detectives testified that shortly before the end of the interrogation, at 4:45 p.m., the defendant made inculpatory statements that the detectives found consistent with CJ's injuries. The interrogation concluded around 5 p.m. with the defendant being returned to interview room six.

At 5:32 p.m., Detective Auguste received a telephone call

**12**

from Ms. Kuntz, who informed him that CJ had officially been pronounced dead at 4:15 p.m. that day. At that time, neither Detective Auguste nor Detective Mahaffey informed the defendant his son was dead. Detective Auguste paged Dr. Staley and spoke with her at 6:45 p.m. Dr. Staley confirmed Ms. Kuntz's statement that CJ had been declared brain dead.

After CJ's death, Detective Golubiak was again assigned to the investigation. Although Detective Golubiak had been assigned to assist the investigation on July 25, 2006, no homicide detective assisted the investigation on the following days until CJ was pronounced dead. Detectives Auguste and Mahaffey conferred with Detective Golubiak and Sergeant Duffin on the direction of the case. The detectives then went to the hospital and told the defendant's family members they needed to come to the police station to speak with an assistant State's Attorney.

Ms. Armstrong testified that she returned to the police station at 5 p.m., shortly after CJ's death and spoke with Detective Golubiak, who again told her she could not see her son. Ms. Armstrong claimed Detective Golubiak told her to come back to the station at 10 p.m. to speak with the assistant State's Attorney. Detective Golubiak denied this conversation occurred.

The detectives' final interrogation of the defendant began shortly before midnight on July 27, 2006. The detectives

**13**

questioned the defendant in interview room six, with the room's video recorder activated. Detective Auguste began the interrogation by informing the defendant that his son was dead. The defendant put his hands over his ears and cried. Detective Auguste gave the defendant time before proceeding with his questioning. Detective Auguste testified the defendant's subsequent confession was "substantially the same" as the inculpatory statements the defendant made during his second interrogation. Detective Auguste testified the defendant never asked to make a phone call, nor did he request an attorney.

### c. Special Order

At the suppression hearing, evidence was presented that at the time of the defendant's interrogations, a special order of the police department, effective July 18, 2005, the effective date of section 103-2.1, mandated the electronic recording of interrogations in aggravated battery cases where death is probable.

A general order, issued a week after the special order, also with an effective date of July 18, 2005, did not contain the requirement of videotaping in aggravated battery cases. The general order indicated it took precedence over any other department directive in the event the directives conflicted.

### d. Order Denying Motion

**14**

In a written order, the trial court denied the defendant's motion to suppress, concluding that the defendant's statements were not inadmissible under section 103-2.1 of the Code because the detectives had not been notified that CJ was declared brain dead until after the second nonrecorded interrogation on July 27, 2006. The court found the evidence did not support a conclusion that CJ's doctors told the detectives that CJ's death was probable before the second interrogation.

The trial court found the general order limiting electronic recording to homicide suspects took precedence over the special order extending those protections to individuals charged with aggravated battery where death is probable. However, the trial court acknowledged that even if the special order controlled, the evidence did not support the defendant's contention that CJ's death was probable before he was officially declared brain dead.

The trial court determined the defendant's statements to the police were voluntary. Based on its review of the video recording, the court found the detectives' questioning of the defendant was conducted in calm, conversational tones with the majority of the detectives' questioning being open-ended, thus allowing the defendant to tell his story. The court pointed out that the defendant was a 17-year-old high school graduate, one month shy of turning 18, and scheduled to attend college. The

**15**

court concluded there were no issues regarding the defendant's mental capacity or intelligence, though the court found the defendant naive with no prior experience with law enforcement. Regarding the defendant's physical condition at the time of his confession, the court concluded there was no evidence that he was sleep deprived or that he was denied access to food or water because the defendant "refused all offers of food." The court found no suggestion of police coercion premised on the defendant being placed in different locations in the police station or on the timing of his interrogations or on the detectives' withholding news of CJ's death until the videotaped interrogation began. The trial court found the detectives' reasoning explaining their conduct credible on all of these issues. The court gave credence to the detectives' testimony that they did not refuse Ms. Armstrong's requests to see her son over Ms. Armstrong's claims that the detectives refused her requests. Based on the totality of the evidence, the court found the defendant's statements were given freely and voluntarily.

Subpoenas Issued to Hospital Personnel

Defense counsel issued subpoenas to Dr. Glick, Dr. Staley, and Ms. Kuntz to appear at the suppression hearing. The prospective witnesses, through hospital counsel, filed a motion to quash the subpoenas. In his response, the defendant claimed

**16**

that Drs. Glick and Staley had independent knowledge of what Detective Auguste was told regarding CJ's condition and the likelihood that he would survive his injuries. The defendant argued this evidence was relevant to whether the detectives were required to record all three of his interrogations. The defendant further argued that the witnesses' knowledge of his physical and mental condition while he was at the hospital was relevant to whether his statements to the police were involuntary.

The court granted the witnesses' motion to quash the subpoenas. The court concluded the testimony of the detectives, along with the materials they had received from the hospital, was sufficient to answer whether they were required to record all three of the defendant's interrogations under section 103-2.1. The court held the knowledge of the hospital personnel as to the defendant's physical and mental condition while at the hospital was irrelevant to the alleged involuntariness of his statements given at the police station.

At the suppression hearing, defense counsel asked the court to reconsider its ruling granting the witnesses' motion to quash the subpoenas. Defense counsel argued that because brain death tests were conducted on CJ on the morning of July 26, 2006, and again on July 27, 2006, the doctors' testimony could shed light

**17**

on whether, and to what extent, the results of those tests were communicated to the detectives. The court denied the defendant's request.

During the final day of the suppression hearing, defense counsel tendered offers of proof of the testimony of the three prospective witnesses. Based on Ms. Kuntz's notes, an offer of proof was made that she would testify that on July 25, 2006, the defendant was distraught. She would also testify that as of 4 p.m. on July 26, 2006, she knew CJ was brain dead and that hospital staff was merely conducting confirmatory tests before making an official pronouncement. Based on CJ's medical records, four offers of proof were made: (1) Dr. Glick would testify that she spoke with the detectives by telephone on July 25, 2006, at 4:45 p.m. and informed them of CJ's "grim prognosis"; (2) Dr. Staley would testify that at 5 p.m. on July 26, 2006, she relayed all relevant information about CJ's condition to the detectives; (3) both doctors would testify that on the morning of July 27, 2006, CJ was brain dead and that repeat brain death exams were positive for brain death; and (4) Dr. Staley would testify that she updated the detectives on CJ's condition at 1 p.m. on July 27, 2006. According to these offers of proof, Drs. Glick and Staley were both aware that CJ was likely brain dead as of July 26, 2006.

No. 1-08-0901

## Motion for _Frye_ Hearing

On July 6, 2007, defense counsel moved for a _Frye_ hearing to determine the admissibility of expert testimony regarding the diagnosis of Shaken Baby Syndrome. The trial court denied the motion, concluding that a _Frye_ hearing was not required because the diagnosis is generally accepted in the medical and legal communities and Illinois courts have applied it universally. The court concluded that any controversy surrounding the syndrome goes to the weight of the evidence, to be tested during cross-examination and by any contrary evidence at trial.

On November 8, 2007, defense counsel filed a motion for reconsideration, citing _People v. McKown_, 226 Ill. 2d 245, 875 N.E.2d 1029 (2007). As support for his motion, the defendant also attached numerous articles from medical journals questioning the validity of Shaken Baby Syndrome diagnosis, as well as decisions from courts of other jurisdictions rejecting the admission of the diagnosis. The trial court found the attached material inapposite because the material questioned the validity of Shaken Baby Syndrome in explaining subdural hematomas and retinal bleeding in the absence of cranial trauma. In the present case, the critical issue centered on whether CJ's skull fracture was consistent with an accident or physical abuse. The trial court denied the defendant's motion for reconsideration.

**19**

Trial

On January 10, 2008, the defendant's bench trial commenced. The Cook County chief medical examiner, Dr. Nancy Jones, Dr. Glick, and Rita Harper, a Chicago police officer, testified for the State. Dr. Shaku Teas, a forensic pathologist, Jasmine Chappell, and Evan Chappell testified for the defense. The parties stipulated to the testimony of Anita Adams, Cynthia Armstrong, Josephine Eatman, Aprileta Briggs, Lisa Kuntz, and Detective Auguste.

Dr. Glick testified as an expert in pediatric medicine. She testified she examined CJ at the hospital and reviewed his medical records, concluding that CJ had a traumatic brain injury manifested by intracranial bleeds, subdural and subarachnoid hematoma, skull fracture, and cerebral edema. She included her findings in the "CPS Consensus Report," including her diagnosis of Shaken Baby Syndrome. Dr. Glick testified that CJ's subdural and subarachnoid bleeds were characteristic of Shaken Baby Syndrome. However, on cross-examination, she acknowledged that such bleeds could also result from a short fall. Dr. Glick acknowledged that the medical literature contains criticisms of the diagnosis of Shaken Baby Syndrome based on the lack of scientifically collected data to support the diagnosis. Dr. Glick testified she disagreed with the authors' conclusions. Dr.

Glick testified CJ's injuries were consistent with the defendant's statement that he shook the baby, threw the baby to the ground, picked the baby up, shook him again and again threw him to the ground.

Dr. Glick testified she collaborates and assists police in child abuse cases by providing them with information. She stated she had multiple discussions with Detectives Auguste and Mahaffey regarding CJ's case; however, she never informed them that CJ would die from his injuries.

Dr. Jones testified as an expert in the field of forensic pathology as to the cause and manner of CJ's death. Dr. Jones performed the autopsy on CJ's body on July 28, 2006. She concluded CJ died as a result of craniocerebral injuries due to blunt head trauma. She opined CJ's death was the result of child abuse and classified the manner of death as a homicide. Dr. Jones testified CJ's injuries were consistent with being shaken and thrown, and were not consistent with a short fall.

Officer Harper testified that around 9:15 a.m. on July 25, 2006, she went to the Armstrong residence, where the defendant, who appeared "calm," told her CJ had fallen to the floor and struck his head on a telephone.

The parties stipulated that Detective Auguste would testify consistent with his testimony at the suppression hearing and that

**21**

Lisa Kuntz would testify consistent with her notes. Ms. Kuntz's notes recounted her interviews with the defendant and his family, the medical reports relating to CJ, and her impressions of the defendant and his family while they were at the hospital. Ms. Kuntz noted that CJ's mother, Aprileta, described the defendant as a good father who had never been abusive to their son. Aprileta told Ms. Kuntz she did not believe the defendant could have hurt CJ. Ms. Kuntz's notes also recount her interview with the defendant, in which he told her that he had been sleeping in the same bed as CJ, but awoke to find him motionless on the floor beside the bed. The defendant told Ms. Kuntz he administered CPR and called the paramedics.

The parties also stipulated that Anita Adams, Cynthia Armstrong, and Josephine Eatman would testify consistent with their testimony at the suppression hearing.

In the defendant's case in chief, Jasmine Chappell, the defendant's sister, and her father, Evan Chappell, testified concerning the defendant's loving care of CJ prior to the incident and his distress over CJ's injuries.

Dr. Shaku Teas testified as the defense's expert in forensic pathology concerning the cause and manner of CJ's death. Dr. Teas did not examine CJ's body; instead, she based her opinion on her review of Dr. Jones' autopsy report. Dr. Teas opined that CJ

**22**

died of cranial cerebral injuries due to blunt trauma and that his injuries were consistent with a fall. Dr. Teas explained that the diagnosis of Shaken Baby Syndrome is the "most controversial diagnosis" in the medical community. Dr. Teas testified that CJ's retinal hemorrhages were not caused by force, but were the result of intracranial pressure. Dr. Teas testified there was no medical evidence that CJ's injuries occurred as a result of shaking, specifically because one of the signs of a shaking injury is injury to the neck, which CJ did not have. Another sign of shaking would be fingertip bruises or marks on CJ's chest, which were not present.

The court found the defendant guilty of the lesser included offense of involuntary manslaughter. Although the court found the State made a strong case for finding the defendant acted with a conscious awareness of a strong probability of death or great bodily harm, the trial court concluded the defendant had no conscious objective to kill CJ and, therefore, found the defendant's conduct reckless. Consistent with a finding of recklessness, the court noted the absence of any prior abuse, the defendant's reputation as a caring and loving parent, and his reaction to CJ's injuries.

Weighing on the side of a guilty verdict, the court found it significant that the defendant made a number of different

statements regarding the cause of CJ's injuries.  The court did not find Dr. Teas' conclusions regarding CJ's manner of death credible because insufficient evidence existed to support a conclusion that CJ's injuries resulted from a fall from a bed.

The defendant timely appeals.

ANALYSIS

The Interrogations

The defendant's first contention is that the statements he gave during each of his interrogations following his arrest for aggravated battery are presumptively inadmissible under section 103-2.1.  Section 103-2.1(b) provides that any statement of an accused made during a custodial interrogation at a police station "shall be presumed to be inadmissible as evidence against the accused in any criminal proceeding brought under Section 9-1 *** of the Criminal Code of 1961 *** unless: (1) an electronic recording is made of the custodial interrogation; and (2) the recording is substantially accurate and not intentionally altered."  725 ILCS 5/103-2.1(b) (West 2006).  While the defendant was initially arrested for aggravated battery to a child, his bench trial proceeded with charges under section 9-1 of the Criminal Code.

The defendant contends that because his first and second interrogations were not electronically recorded, but were

**24**

required to be recorded under section 103-2.1, "then any statements made by the defendant during or <u>following</u> that non-recorded custodial interrogation, even if otherwise in compliance with this Section, are presumed inadmissible."  (Emphasis added.) 725 ILCS 5/103-2.1(d) (West 2006).  According to the defendant, the clear aim of subsection (d) is to eliminate a test run of the defendant's interrogation (not electronically recorded) before a properly recorded interrogation (essentially the same as the preceding interrogation) is conducted.  The defendant points to Detective Auguste's testimony that the defendant's confession during the third interrogation was "substantially the same" as the inculpatory statements the defendant made during his second interrogation.  Before an electronically recorded interrogation may be deemed presumptively inadmissible, however, there must be a judicial finding, supported by a preponderance of the evidence, that the preceding interrogation was conducted in violation of section 103-2.1.  725 ILCS 5/103-2.1(d) (West 2006).

Section 103-2.1 is subject to numerous exceptions set out in subsection (e) that preclude a finding of a violation.  Only one of the listed exceptions is pertinent here: "Nothing in this Section precludes the admission *** (viii) of a statement given at a time when the interrogators are unaware that a death has in fact occurred."  725 ILCS 5/103-2.1(e)(viii) (West 2006).  The

**25**

trial court found this exception to apply, a ruling we determine presents a question of law, subject to de novo review. See People v. Hansen, 327 Ill. App. 3d 1012, 1016, 765 N.E.2d 1033 (2002) (de novo review applies where issue raises a question of statutory interpretation or other question of law).

The defendant's argument that exception (viii) does not apply in this case is grounded on his claim that "death" equates with a determination that CJ was brain dead. He argues, "It is well-settled that a person who is brain dead is legally dead," citing People v. Lara, 289 Ill. App. 3d 675, 681, 683 N.E.2d 480 (1997), and In re Haymer, 115 Ill. App. 3d 349, 355, 450 N.E.2d 940 (1983). The defendant asserts, "[T]he legislature undoubtedly intended 'death' to include brain dead."

He contends that the interrogators' awareness that CJ was brain dead turns on the information the detectives received from the hospital personnel beginning with CJ's hospitalization. During the suppression hearing on the admissibility of his statements under section 103-2.1, the defendant made offers of proof claiming to show that CJ was brain dead on the morning of July 27, 2006, and was likely brain dead on July 26, 2006. According to the defendant, the hospital personnel were subpoenaed to testify regarding CJ's brain activity during this period, findings of which he contends were conveyed to the

**26**

investigating detectives prior the defendant's first and second interrogations.  If the detectives were in fact aware that CJ was brain dead prior to the first interrogation, then the statements from the first and second interrogations would be presumptively inadmissible under section 103-2.1(b).

The defendant argues that because the first two interrogations were not electronically recorded, but should have been, the defendant's statements from the third interrogation, which was electronically recorded, would also be deemed presumptively inadmissible under subsection (d).  According to the defendant, under the circumstances present in this case, excusing the police's failure to record all of the defendant's interrogations would violate the spirit and purpose of the statute.  Based on this argument, it follows that the trial court erred in quashing the subpoenas to the hospital personnel to testify at the suppression hearing.

The trial court ruled that exception (viii) applied because the detectives were not made aware of CJ's death until after the second interrogation was completed.  In the language of the subsection, during the second interrogation, the detectives were "unaware that a death [had] in fact occurred."  725 ILCS 5/103-2.1(e)(viii) (West 2006).  According to the trial court's finding, the investigators were unaware that CJ was dead until

**27**

Detective Auguste received a telephone call from Ms. Kuntz at 5:32 p.m. on July 27, 2006, a half hour after the second interrogation concluded. Based on this finding, the State met its burden of proving, by a preponderance of the evidence, that exception (viii) applied. 725 ILCS 5/103-2.1(e)(viii) (West 2006).

The plain and clear language of exception (viii) requires two factual determinations before the exception is triggered: (1) a death has occurred; and (2) the interrogators are aware of the death. The defendant focuses primarily on the latter factual determination to support his claim that the exception does not apply. We conclude that the former must first be determined before context can be given to the latter.

The defendant argues that beginning with CJ's bottom score on the Glasgow Coma Scale upon admission to the hospital, and the brain death exams repeatedly conducted on CJ, including one at 5 p.m. on July 26, 2006, CJ was "legally dead" before the first, nonrecorded custodial interrogation of the defendant. Implicit in this argument is that the trial court's finding of when death came to CJ is not controlled by the medical declaration of brain death. We disagree.

> "Although the courts have refused to
> establish criteria for determining brain

**28**

death because the advent of new research and
technologies continues to change the tests
used for determining cessation of brain
function, they have required that a diagnosis
of brain death be made in accordance with the
'usual and customary standards of medical
practice.' [Citation.]  Therefore, expert
medical opinion is necessary to a
determination of brain death. [Citation.]"
Lara, 289 Ill. App. 3d at 681, quoting Janus
v. Tarasewicz, 135 Ill. App. 3d 936, 941, 482
N.E.2d 418 (1985).

Brain death is a medical finding based on the prevailing
standards of medical practice.  We look to expert medical opinion
for that determination.  We reject the defendant's contention
that whether CJ was brain dead at any point prior to 4:15 p.m. on
July 27, 2006, is a legal determination that may be made
irrespective of the medical declaration that brain death occurred
at a specified time.  That courts look to the medical declaration
of death is in line with the holding in Haymer.  "In this regard,
we find it significant that the legislature's definition of death
under the Uniform Anatomical Gift Act conforms to the consensus
of the medical community that total brain death is the death of

the person, and that adoption of that definition of death in the present case will conform the legal definition of death in Illinois to current medical standards." Haymer, 115 Ill. App. 3d at 354. The legal finding of death is inextricably linked to the medical diagnosis of death. In Haymer, we held that when the heart stopped functioning did not mark when death occurred. Rather, death occurred when "irreversible cessation of total brain function, according to usual and customary standards of medical practice," occurred. Haymer, 115 Ill. App. 3d at 356-57. In other words, we determined that the person was legally dead as of the date he was diagnosed as brain dead. Haymer, 115 Ill. App. 3d at 356-57.

The defendant's contention here challenging the reliance on the medical determination of when CJ was brain dead is not unlike the defendant's contention in Lara that death was caused not by the blunt force he applied to the decedent's head, but to the "premature termination of life support measures at the hospital." Lara, 289 Ill. App. 3d at 681. We rejected the contention in Lara that death only occurred with the termination of life support measures. Rather, we held death occurred when the medical "diagnosis of death was made according to usual and customary standards of medical practice." Lara, 289 Ill. App. 3d at 681. So too here. Death did not come to CJ until he was

medically declared dead at 4:15 p.m. on July 27, 2006, after all confirmatory brain death exams required by usual and customary standards of medical practice were conducted. We note, no contrary expert medical opinion regarding the time of brain death was presented at trial. See Lara, 289 Ill. App. 3d at 681 ("expert medical opinion is necessary to a determination of brain death").

Because it is uncontested that the interrogating detectives were not informed of the medical diagnosis of brain death until after the second interrogation had concluded, we can reach no other legal conclusion than exception (viii) of section 103-2.1(e) applies. Under the facts of this case, it follows that only the third interrogation was required to be electronically recorded pursuant to section 103-2.1. Because section 103-2.1 was not violated in this case, no error occurred in admitting the defendant's statements from all three interrogations.

Subpoenas to Hospital Personnel

Our determination that exception (viii) of section 103-2.1(e) applies because the detectives were not aware of CJ's death until they were informed that CJ died at 4:15 p.m. on July 27, 2006, grounds our conclusion that no error occurred in the quashing of the defendant's subpoenas to the hospital personnel. The offers of proof do not challenge the medical determination as

**31**

to the time of CJ's death.  We also note that Dr. Glick, one of the hospital personnel subpoenaed for the suppress hearing, testified at trial that she came to no conclusion as to the brain death of CJ at odds with the official pronouncement of death. Obviously, having come to no differing opinion, Dr. Glick could not have passed information to the detectives suggesting that CJ was brain dead before the medical diagnosis was made.

We note that even if the defendant is correct that his statements given at the three interrogations are presumptively inadmissible under section 103-2.1, this entitles him to no relief unless the trial court erred in its ruling that his statements were voluntarily given.  "The presumption of inadmissibility of a statement *** may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable ***."  725 ILCS 5/103-2.1(f) (West 2006). Subsection (f) is a fail-safe provision providing for the admission of statements elicited in violation of subsection (b) where the error is rendered harmless by a showing, based on the preponderance of the evidence, that the presumptively inadmissible statements were given voluntarily and are reliable. We turn to the defendant's voluntariness issue.

Voluntariness of Statements

In determining whether a defendant's statements are

**32**

voluntarily made, a court must look to the totality of the circumstances surrounding the making of the statements. People v. Brown, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996). The court considers the defendant's age, education, background, experience, mental capacity, and intelligence, as well as the defendant's physical and emotional condition at the time of questioning, the duration of the questioning, and whether the defendant was subjected to physical or mental abuse by the police. People v. Mitchell, 366 Ill. App. 3d 1044, 1049, 853 N.E.2d 900 (2006). A lower court's ultimate ruling that the defendant's statement was voluntary is subject to de novo review. People v. Sanchez, 362 Ill. App. 3d 1093, 841 N.E.2d 478 (2005). Where the defendant challenges the admissibility of his confession through a motion to suppress, the State bears the burden of proving by a preponderance of the evidence that the confession was voluntary. People v. Braggs, 209 Ill. 2d 492, 505, 810 N.E.2d 472 (2003).

The defendant contends several factors weigh heavily against the trial court's finding that his inculpatory statements were voluntarily made. Relying on People v. Richardson, 376 Ill. App. 3d 537, 542, 875 N.E.2d 1202 (2007), the defendant argues that because he was only 17 years old at the time and, therefore, a

purported "minor,"[1] careful scrutiny of the circumstances of his interrogation is required to ensure his statements were not coerced.  The defendant further points to his lack of experience with the criminal justice system, to the absence of an adult present during his questioning, to his lack of a criminal history, and to the absence of any gang affiliation, as factors weighing against a finding that his statements were voluntarily made to the police.  The defendant also argues his physical, mental, and emotional conditions at the time of the interrogations weigh against the admissibility of his statements.

---

[1] The defendant offers no authority for his suggestion that at 17 years old, he was subject to additional protection as a juvenile.  The Juvenile Court Act of 1987 in effect at the time of the defendant's arrest provides that "no minor who was under 17 years of age at the time of the alleged offense may be prosecuted under the criminal laws of this State."  (Emphasis added.)  705 ILCS 405/5-120 (West 2006).  Moreover, certain classes of defendants are excluded under the Act, regardless of whether they are under the age of 17, based on the crime they are charged with committing, including first degree murder.  705 ILCS 405/5-125, 5-130, 5-805, 5-810 (West 2006).

The defendant contends he had not eaten, was sleep deprived, and was distraught over his son's injuries at the time of his interrogations.

In finding the defendant's statements were voluntary, the trial court specifically addressed each of the factors the defendant now argues weigh against the admissibility of his statements, finding the evidence did not support the defendant's contentions. We are unpersuaded that the trial court's findings of fact are against the manifest weight of the evidence. In re G.O., 191 Ill. 2d 37, 50, 727 N.E.2d 1003 (2000). Based on our de novo review of the ultimate decision by the trial court that the statements were voluntary, on the record before us we reach the same conclusion. G.O., 191 Ill. 2d at 50.

The trial court properly concluded that the State proved, by a preponderance of the evidence, that the defendant's statements to the detectives were voluntarily made and reliable. Therefore, the trial court properly denied the defendant's motion to suppress.

### Frye Hearing

Finally, the defendant argues that under the guidance of People v. McKown, 226 Ill. 2d 245, 875 N.E.2d 1029 (2007), the trial court erred in taking judicial notice that the "highly controversial" diagnosis of Shaken Baby Syndrome is generally

**35**

accepted without first holding a hearing under <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923).  In his motion for a <u>Frye</u> hearing, the defendant requested a ruling as to the admissibility of the expert testimony under the particular facts of this case, among other requested rulings.  Based on the broad requests for rulings, the trial court concluded that "the determinations sought by the Defense essentially go well beyond what <u>Frye</u> contemplates."  As the trial court noted, "<u>Frye</u> determines general acceptance of a given methodology or principle, not its application to the case at hand."

The "general acceptance" test set forth in <u>Frye</u> provides that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is " ' "sufficiently established to have gained general acceptance in the particular field in which it belongs." ' " <u>McKown</u>, 226 Ill. 2d at 254, quoting <u>In re Commitment of Simons</u>, 213 Ill. 2d 523, 530, 821 N.E.2d 1184 (2004), quoting <u>Frye</u>, 293 F. at 1014.  The trial court may determine whether the scientific principle or methodology meets the general acceptance test in either of two ways: (1) based on the results of a <u>Frye</u> hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. <u>McKown</u>, 226 Ill. 2d at 254.

**36**

Here, the trial court took judicial notice that Shaken Baby Syndrome is generally accepted in the relevant scientific field based on prior judicial decisions and, therefore, admissible as scientific evidence at trial.  See, e.g., People v. Rader, 272 Ill. App. 3d 796, 651 N.E.2d 258 (1995); State v. McClory, 207 Conn. 233, 541 A.2d 96 (1988) (listing six other states that have found Shaken Baby Syndrome generally accepted medical theory); People v. Swart, 369 Ill. App. 3d 614, 631, 860 N.E.2d 1142 (2006) (Shaken Baby Syndrome theory challenged as " 'highly controversial' and 'hotly contested,' " but under Frye, "general acceptance does not require that the methodology be accepted by unanimity, consensus, or even a majority of experts").  The defendant argues it was improper for the court to do so based on our supreme court's decision in McKown.

In McKown, the supreme court held that it was an error to take judicial notice of the general acceptance of the Horizontal Gaze Nystagmus (HGN) test as an indicator of alcohol impairment. McKown, 226 Ill. 2d at 275.  Based on the varying opinions expressed in articles on the subject, the differing judicial opinions, and the fact that a Frye hearing was never held on the matter, the supreme court held that a Frye hearing was required to determine whether the HGN test had been generally accepted as a reliable indicator of alcohol impairment.  McKown, 226 Ill. 2d

37

at 275.

The defendant argues that similar to the HGN test addressed by McKown, Shaken Baby Syndrome, as a scientific theory, is novel, despite the fact that it has been introduced in courts for many years, because there is no reported decision in Illinois finding general acceptance as a result of a Frye hearing. The defendant contends the technical writings and other courts' decisions on the diagnosis, particularly of late, do not present an unequivocal viewpoint on the issue such that judicial notice is proper. In his motion for reconsideration, the defendant cited several articles by medical scholars that challenge the validity of Shaken Baby Syndrome. At trial, Dr. Teas testified the syndrome is the "most controversial diagnosis" in the medial community.

The State argues the trial court properly permitted expert witness Dr. Glick to testify concerning Shaken Baby Syndrome without holding a Frye hearing. The State argues Shaken Baby Syndrome is not a novel scientific principle as it has gained acceptance in both the medical and legal communities. The State contends a review of recent decisions from reviewing courts across the country shows that Shaken Baby Syndrome has been properly established under the Frye standard. The American Academy of Pediatrics and the United States Centers for Disease

**38**

Control recognize that shaking a baby can result in death or permanent neurological disability.

The State also argues that even if it was error to admit the Shaken Baby Syndrome testimony without conducting a Frye hearing, such an error was harmless as the cause of death was blunt force trauma to CJ's skull; Shaken Baby Syndrome was offered to explain the other injuries CJ sustained. Dr. Jones performed CJ's autopsy and opined, without reference to Shaken Baby Syndrome, that CJ's brain injuries resulted from blunt force impact constituting child abuse. In his videotaped statement, the defendant admitted he threw CJ to the floor twice. Based on this evidence, the State contends that any error in the admission of Dr. Glick's testimony concerning Shaken Baby Syndrome was at most harmless.

The defendant maintains the admission of the evidence was not harmless because the State's main witness, Dr. Glick, based her entire diagnosis of CJ on Shaken Baby Syndrome. In contrast, Dr. Teas, the defendant's expert, testified that CJ's injuries were consistent with a short fall as the defendant originally stated had happened. Based on the conflicting theories offered by the experts, the defendant argues that without Dr. Glick's testimony regarding Shaken Baby Syndrome, the defense's primary theory that CJ's injuries were consistent with a short fall from

**39**

a bed would have been "bolstered significantly." We disagree.

This argument by the defendant is undermined by the trial court's ruling on the defendant's motion to reconsider regarding the Frye hearing request. The trial court noted that CJ's skull fracture distinguished this case from the authorities cited by the defendant because there was no direct evidence that CJ's death was the result of Shaken Baby Syndrome, rather than blunt head trauma. We also note that unlike the situation in McKown, the defendant cites no conflicting Illinois judicial decision on the admissibility of Shaken Baby Syndrome. McKown, 226 Ill. 2d at 257-58 ("our own appellate court has issued divergent opinions on the topic [of HGN]").

To the extent questions remain as to acceptance in the medical and legal communities of the scientific validity of Shaken Baby Syndrome as a diagnosis, we conclude this is not the case to provide an answer to whether the trial court's decision to take judicial notice of the diagnosis constitutes reversible error. See People v. Swart, 369 Ill. App. 3d 614, 632, 860 N.E.2d 1142 (2006) ("defendant has waived any challenge under Frye to the scientific evidence" concerning shaken baby syndrome). Based on our review of the record, the guilty verdict did not turn on the admission of the evidence relating to the syndrome. "When a defendant challenges the admission of

**40**

evidence, we may hold the admission to be harmless '[w]hen the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result.' " McKown, 226 Ill. 2d at 276, quoting People v. Arman, 131 Ill. 2d 115, 124, 545 N.E.2d 658 (1989).

We find the evidence of CJ's cause of death of blunt force trauma caused by the defendant's throwing CJ to the floor to be overwhelming. In his videotaped statement, the defendant confessed to throwing CJ to the floor twice. Dr. Jones testified the cause of CJ's death was cranial cerebral injury due to blunt head trauma from child abuse; she did not make a finding or offer testimony regarding Shaken Baby Syndrome. While Dr. Glick testified that certain injuries to CJ were consistent with Shaken Baby Syndrome, she testified that CJ's skull fracture and cerebral edema were consistent with CJ being thrown to the floor twice, much as the defendant described doing in his videotaped confession. Dr. Teas, the defendant's expert, also testified that CJ died of cranial cerebral injuries caused by blunt trauma, while contending that the injuries were consistent with a fall. The physical evidence showed CJ suffered a skull fracture and it was uncontested that the defendant was alone with CJ at the time

**41**

he suffered his injuries. It was for the trier of fact to determine which of the differing opinions offered to explain CJ's blunt trauma was credible. It was well within the role of the trial court, as trier of fact, to reject Dr. Teas's medical opinion as unsupported by the evidence.

In light of the overwhelming competent evidence in the record, the defendant's guilt was established beyond a reasonable doubt, and a retrial without the allegedly erroneous evidence would not change the result.

CONCLUSION

The defendant's statements given during nonrecorded and electronically recorded interrogations were properly admitted because the presumptive inadmissibility of such statements under section 103-2.1(b) was not triggered until the defendant's son was medically declared dead, which did not occur until after the two nonrecorded interrogations were concluded. Because the medical declaration of death controls, the subpoenas issued to hospital personnel were properly quashed, as no conflicting expert testimony was offered to challenge the time of the diagnosis of brain death. The defendant's custodial statements were voluntarily given under the totality of the circumstances standard. The failure to conduct a Frye hearing before the admission of expert testimony on Shaken Baby Syndrome was at

**42**

No. 1-08-0901

worse harmless error.  We affirm the judgment of the circuit court of Cook County.

Affirmed.

HALL, P.J., and PATTI, J., concur.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

CARL ARMSTRONG,

Defendant-Appellant.

No. 1-08-0901

Appellate Court of Illinois
First District, First Division

Filed: NOVEMBER 2, 2009

JUSTICE GARCIA delivered the opinion of the court.

HALL, P.J., and PATTI, J., concur.

Appeal from the Circuit Court of Cook County
Honorable Michael P. Toomin, Judge Presiding

| For PLAINTIFF-APPELLEE | James E. Fitzgerald |
| | Alan J. Spellburg |
| | Jon Walters |
| | ANITA ALVAREZ, State's Attorney, County of Cook |
| | Richard J. Daley Center–Room 309 |
| | Chicago, Illinois 60602 |
| For DEFENDANT- | J. Kevin McCall |

No. 1-08-0901

APPELLANT  Kevin Case
JENNER & BLOCK, LLP
330 North Wabash Avenue
Chicago, Illinois 60611